## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

MONDREA RENEE SCOTT                                                    PLAINTIFF

V.                              No. 1:16CV00086-KGB-JTR

JAMES BANKS, Warden, Grimes Unit;
and DARRYL GOLDEN, Warden,
McPherson Unit                                                        DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent
to United States District Judge Kristine G. Baker. You may file written objections
to all or part of this Recommendation. If you do so, those objections must: (1)
specifically explain the factual and/or legal basis for your objection; and (2) be
received by the Clerk of this Court within fourteen (14) days of the date of this
Recommendation. If you do not file objections, Judge Baker can adopt this
Recommendation without independently reviewing all of the evidence in the record.
By not objecting, you may waive the right to appeal questions of fact.

## I.  Introduction

In this *pro se* § 1983 action, Plaintiff Mondrea Renee Scott ("Scott") alleges
that, while she was an inmate in the McPherson Unit of the Arkansas Department of
Correction ("ADC"), Defendants Warden James Banks ("Banks") and Warden

Darryl Golden ("Golden") violated her due process and equal protection rights by refusing to grant her applications to marry Shana Struble ("Struble"), a former inmate in the McPherson Unit.[1]

Banks and Golden have filed a Motion for Summary Judgment, a Brief in Support, a Statement of Facts, and a Reply, arguing that they are entitled to judgment, as a matter of law, on the due process and equal protection claims Scott is asserting against them.[2] *Docs. 69, 70, 71 & 78.* Scott has filed a Response, a Brief, and two Statements of Facts in opposition to Defendants' Motion. *Docs. 74, 75, 76 & 77.*

Scott has also filed a Motion for Summary Judgment, and supporting motion papers. *Docs. 52, 59, 60, 61 & 62.* Defendants have filed Responses, Briefs and Statements of Fact in opposition to Scott's Motion. *Docs. 56, 57, 58, 63, 64 & 65.*[3]

---

[1]Scott was incarcerated when she commenced this action on July 13, 2016. *Doc. 2.* After her release, in February or March of 2017, she elected to continue to pursue this action. *Doc. 19.*

[2]In earlier Orders, the Court dismissed: (1) all of the claims Scott asserted against Defendants in their official capacities; (2) Scott's claim for injunctive relief; (3) all of Scott's claims against the ADC; and (4) all of Scott's claims against Defendant Dexter Payne, the Deputy Director of the ADC. *See Docs. 6, 23, 28, 51 & 68.*

[3]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

Before addressing the merits of the parties' cross Motions for Summary Judgment, the Court will summarize the relevant facts giving rise to Scott's constitutional claims:

1.    ADC Administrative Directive 13-59 ("AD 13-59") sets forth the ADC's policy governing inmate marriages. *See Att. A to Ex. 1 of Doc. 69*. It provides that inmates "are permitted to marry when such action is consistent with the laws of the state of Arkansas and follows the procedures set out [therein.]" The directive makes it clear that an inmate's "right to marry … must be exercised in a manner that is consistent with the security and good order of the institution." *Id.* §§ I & II.

2.    An inmate must file an application to marry with the unit warden, who has the discretion to grant or deny the application, based on whether it is deemed to be "consistent with the security and good order of the institution." *Id.* §§ I, II, III, IV(A) & (M).

3.    The chaplains at each ADC prison have administrative responsibilities under AD 13-59 § III. After being informed by an inmate of his or her intention to marry, a unit chaplain sends the inmate a "marriage packet," which includes instructions and a marriage application form. *See Doc. 9 at 2 & Ex. E.*

4.    The marriage application form states that the prospective spouse must be on the inmate's "approved visitor list," but neither AD 13-59 nor the instructions in the "marriage packet" explain: (1) *how* an inmate should go about getting a

prospective spouse added to his or her approved visitation list; or (2) *the criteria* for allowing a prospective spouse to be on that list. The chaplain's written instructions to the inmate state only that, if the prospective spouse is *not* on the approved visitation list, the "request for marriage will be denied by the Warden." *Doc. 9, Ex. E.*

5.     On June 26, 2015, the Court issued its decision in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), which recognized that individuals have a Fourteenth Amendment right to marry someone of the same sex.

6.     On September 21, 2015, Struble[4] e-mailed ADC Director Wendy Kelley asking when AD 13-59 would be changed to allow inmates to marry partners of the same sex. *Doc. 35, Ex. 1.* Struble was a *former inmate* in the McPherson Unit who had served time with Scott, and had been released on parole for about five years. *Doc. 60 at 2; Doc. 77 ¶7.*  In her e-mail, Struble advised Director Kelley that she and Scott, who was still incarcerated in the McPherson Unit, planned to get married. *Doc. 35, Ex. 1.*

7.     In her e-mail response to Struble, dated September 21, 2015, Kelley

---

[4]In some documents, Struble is referred to as "Shana Jensen," which appears to be the name she used when she was convicted and sentenced to the ADC in 2007. *See State v. Shana Marie Jensen,* Boone Co. Cir. Ct. Nos. 05CR-07-18 & 05CR-07-19 (accessible at https://caseinfo.arcourts.gov). According to the Boone County Circuit Court records, which are available to the public, Struble was convicted on June 1, 2007, and sentenced to 144 months in the ADC for theft of property, financial or non-financial identity fraud, fraudulent use of a credit card or debit card, and forgery.

stated that she did "not believe a change to our [marriage] policy will be required," and that "[t]he inmate in question [Scott] need[ed] to initiate the [marriage] process with the chaplain." *Id.*

8.    On October 2, 2015, Scott submitted an application to marry Struble. *Doc. 71 ¶ 6; Doc. 76 ¶ 2.* As the McPherson Unit Warden,[5] Banks was responsible for deciding whether to grant or deny Scott's same-sex marriage application.

9.    On December 2, 2015, Keith Chamberlain, a chaplain at the McPherson Unit, sent a memo to Scott which stated: "Your application for marriage has been denied by the Warden [Banks]." *Doc. 35, Ex. 2.* No reason was given for Banks's denial of Scott's application to marry Struble.

10.    In early January of 2016, Golden replaced Banks as Warden of the McPherson Unit. *Doc. 30 ¶ 5.* Shortly thereafter, Scott submitted a second application to marry Struble. *Doc. 71 ¶ 6.* It then became Golden's responsibility to grant or deny Scott's same-sex marriage application.

11.    On February 26, 2016, Nicole Lang, a chaplain at the McPherson Unit, sent a memo to Scott which stated: "Please be advised that Warden Golden has denied your application for marriage." *Doc. 35, Ex. 3.* No reason was given for

---

[5]From December 2014 to December 31, 2015, Banks was the Warden of the McPherson Unit. *Doc. 30 ¶ 5* (Defs.' Answer). It is undisputed that he was the decision-maker who reviewed and denied Scott's marriage application on December 2, 2015. *Doc. 2 at 3; Doc. 35 ¶ 2 & Ex. 2; Doc. 76 ¶ 2.*

Golden's denial of Scott's application to marry Struble.

12.     It is undisputed that Struble was a parolee for a number of years before Scott filed her applications to marry her. There is nothing in Defendants' summary judgment papers about the conviction that led to Struble's incarceration; her disciplinary history while incarcerated in the McPherson Unit; when she was paroled; or how she performed while on parole.

13.     At the time Scott submitted her marriage applications, Struble was not on Scott's "approved visitation list." *Doc. 56, Ex. A at 39-41* (Scott Dep.); *Doc. 36, Ex. C at 2 & 5.* There is nothing in the record suggesting that Struble ever attempted to visit Scott, after she was released on parole, or that Scott ever tried to have Struble added to her "approved visitation list."

14.     On March 12, 2016, Scott filed a Grievance, complaining that both Banks *and* Golden had denied her separate applications to marry Struble "due to [her] partner and [her] being the same sex." *Doc. 36, Ex. C at 3.* She also explained why she believed her constitutional rights had been violated:

> Marriage is a fundamental constitutional right that I can retain whether confined or not. To deny this right violates … my constitutional right in marrying someone I've been with for 10 years. I shouldn't be discriminated against based on my sexual orientation.

*Id.*

15.     On April 6, 2016, Golden wrote a "Memorandum" to Scott, which stated the following:

Please be advised that I have received your grievance regarding your request to marry. In your grievance you allege that I am denying your opportunity to marry Shana M. Struble because you are of the same sex. I absolutely deny this as the reason why I have denied Ms. Struble and you to marry. You were denied the opportunity because of several reasons. *First*, Ms. Struble is a convicted felon that is still on supervised parole until 2019. In reviewing your application for approval this fact contradicts the agency's responsibility to ensure appropriate security practices on inmates [sic] contact with other known felons in and outside the prison. *Secondly*, Ms. Struble and you had an offender separation during her incarceration here in the Arkansas Department of Correction which is still in effect and will be enforced if ever she returns. *Thirdly*, Ms. Struble is not listed on your approved visitors list or on your relatives and associates list because of her status as a parolee. Let me assure you we will follow the laws of this land and our state in regards to allowing those who are eligible to marry and who meet our security and policy practices and guidelines regardless of sexual orientation. The issue of you not being afforded the opportunity to marry Ms. Struble is solely due impart [sic] with her present status on parole and your status as an inmate here at the McPherson Unit.

*Doc. 36, Ex. C at 5* (emphasis added).

16.     On April 20, 2016, Golden filed a Response to Scott's Grievance, finding it was without merit. In his Response, he used the *identical language* from his April 6, 2016 Memorandum to explain his reasons for denying Scott's application to marry Struble. *Doc. 36, Ex. C at 2.*

17.     On May 4, 2016, ADC Deputy Director Dexter Payne affirmed the denial of Scott's Grievance. *Doc. 36, Ex. C at 1.*

18.     In February or early March of 2017, Scott was paroled from the ADC. *Doc. 19.* On March 18, 2017, Scott and Struble were married in Tarrant County, Texas. *See* https://ccrecordse.tarrantcounty.com/Marriage/Search_Results.aspx.

19.     The current record contains *nothing at all* about the reasons Banks denied Scott's first application to marry Struble. As far as Golden's reasons for denying Scott's second application, the record contains only his Memorandum and Response to her Grievance, which state vague "security concerns" that are in no way "obvious" and appear to be in conflict with other provisions in AD 13-59. *See supra ¶¶ 15-16.*

20.     Banks and Golden are the only witnesses with *personal knowledge* about the specific facts supporting: (1) their reasons for denying Scott's applications to marry; (2) why those reasons represent legitimate penological considerations; and (3) their affirmative defense of qualified immunity. Under Rule 56(c)(4) of the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support … a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Because Banks and Golden did not execute a sworn Affidavit or Declaration, there are no properly developed facts in the record to support their Motion for Summary Judgment.

21.     Instead, Defendants' Motion for Summary Judgment and accompanying Statement of Undisputed Material Facts rest entirely on a *hearsay* Declaration from Chaplain Lang, dated September 10, 2018. *See Doc. 69, Ex. 1.* Lang's Declaration contains only vague hearsay statements about why Golden

denied Scott's marriage application "based upon security concerns related to: 1) [Struble's] status as [a] convicted felon still on parole; and 2) a previous contraband incident between Scott and [Struble] while they were both incarcerated which led to Scott and [Struble] being placed in offender separation status." *Doc. 69, Ex. 1 ¶ 5.* Lang's Declaration does not mention *anything* about why Banks denied Scott's first application to marry Struble.

## II. Discussion

In her summary judgment papers, Scott argues that: (1) the reasons given by Defendants for denying her marriage requests are mere "excuses" -- not "justifiable reasons"; and (2) Defendants are applying AD 13-59 arbitrarily and inconsistently in a way that is designed to "cover up" discrimination, bias, and "personal judgment" related to same-sex marriages. According to Scott, she is entitled to judgment, as a matter of law, on her due process and equal protection claims against Banks and Golden.[6] *Docs. 60-61, 74-77.*

---

[6]In her original Complaint, Scott sought compensatory and punitive damages against Banks and Golden, along with an injunction requiring them to let her marry Struble. *Doc. 2 at 4.*

In an Order, entered on October 16, 2017, the Court ruled that: (1) because Scott did not allege any physical injury, the Prison Litigation Reform Act barred her from recovering compensatory damages for mental or emotional distress; and (2) because Scott was no longer incarcerated in the ADC, she was not entitled to injunctive relief. *Doc. 23 at 2-3 & n.3; Doc. 28.* Thus, if Scott prevails on her constitutional claims, she may only be allowed to recover nominal damages from Banks and Golden, along with punitive damages, *if* a jury finds the constitutional violation was "motivated by evil motive or intent" or involved "reckless or callous indifference." *See McAdoo v. Martin,* 899 F.3d 521, 527 (8th Cir. 2018).

Banks and Golden argue they are entitled to summary judgment based on two alternative grounds: (1) Scott cannot recover damages because she did not sue them in their "individual capacity"; and (2) in any event, qualified immunity protects them from liability for damages. *Docs. 69-70.*

## A. Scott's Complaint Properly Asserted Her Constitutional Claims Against Banks and Golden, in Their Individual Capacity

In its Recommended Partial Disposition screening Scott's *pro se* Complaint, the Court liberally construed her allegations, as it was required to do,[7] and concluded that she had asserted her "equal protection and due process claims against Banks [and] Golden …, *in their individual capacities only .…*" Doc. 23 at 2-3.[8] Thereafter, Defendants had fourteen days to object to the Court's recommendation that Scott be allowed to proceed with her constitutional claims against Banks and Golden, *in their individual capacity*. Defendants did *not* file any objections to the Recommended Partial Disposition.

On October 16, 2017, United States District Judge Kristine G. Baker entered an Order adopting the Recommended Partial Disposition. *Doc. 28.* This Order

---

[7]*See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (*pro se* complaint must be "liberally construed" and "*pro se* litigants are held to a lesser pleading standard than other parties").

[8]In her Complaint, Scott alleged that "each Defendant is involved … in denying my request to marry Shana Marie Struble." *Doc. 2 at 4.* The Court construed that allegation to mean Scott was asserting her claims for compensatory and punitive damages against Banks and Golden, *in their individual capacity,* based on their personal involvement in making the decisions that allegedly violated Scott's constitutional rights.

allowed Scott to "proceed with her due process and equal protection claims against separate defendants James Banks, [and] Darryl Golden … in their individual capacities." *Id. at 1*. Banks and Golden then filed an Answer denying those individual capacity claims, *on the merits*. *Doc. 30 ¶ 13*.

Thus, the Court concludes that Banks and Golden have waived the argument they are now attempting to resurrect that Scott's Complaint did not assert her constitutional claims for compensatory and punitive against them in their individual capacity. Accordingly, their Motion for Summary Judgment on that ground should be denied.

### B.    Defendants' Motion for Summary Judgment Fails to Establish That They Are Entitled to Qualified Immunity

As state actors, Banks and Golden's claim of qualified immunity turns on whether: (1) the supported facts, viewed in the light most favorable to Scott, show that Banks and Golden violated her constitutional rights; and (2) those constitutional rights were clearly established at the time of the alleged violation. To avoid summary judgment, Scott has the burden of demonstrating both of those propositions. *See Ashcroft v. Al–Kidd*, 563 U.S. 731, 735 (2011); *Church v. Anderson,* 898 F.3d 830, 832 (8th Cir. 2018) (to overcome a qualified immunity defense at the summary judgment stage, "[the plaintiff] bears the burden of showing that the facts alleged, construed in the light most favorable to [the plaintiff], demonstrate the violation of a constitutional right that was clearly established at the time of the violation.").

1.    **At the Time of the Alleged Constitutional Violation, Scott's Right to Marry Struble Was Clearly Established Under the Fourteenth Amendment**

In *Turner v. Safley,* 482 U.S. 78 (1987), the Court addressed the constitutionality of a Missouri state prison regulation that severely restricted the fundamental right of male and female inmates to marry someone of the opposite sex.[9] *Id.* at 95-96. The regulation provided that an inmate could only marry if "there are compelling reasons to do so," as determined by the prison superintendent. The regulation did not define the term "compelling," but prison officials testified that "generally only a pregnancy or the birth of an illegitimate child would be considered a compelling reason" for granting an inmate's request to marry. *Id.* at 82, 96-97.

In evaluating the constitutionality of the prison regulation, which significantly restricted the fundamental right of inmates to marry, the Court held that four factors must be considered: (1) whether the regulation had a "valid rational connection" to a legitimate governmental interest; (2) whether alternative means were open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates, and prison resources; and (4) whether there were "ready alternatives" to the regulation. *Id.* at 89-91. However, in considering those factors, judicial restraint must be exercised because running a prison is an

---

[9]In 1987, it was the law in every state that a legal marriage could only take place between a woman and a man.

"inordinately difficult undertaking" that involves "expertise [and] planning … which are peculiarly within the province of the legislative and executive branches of government." *Id.* at 84-85. Finally, the Court observed that, where a "state's penal system is involved, federal courts have additional reasons to accord deference to the appropriate prison authorities." *Id.* at 85.

The Court began its constitutional analysis by carefully considering the testimony of prison officials about the "legitimate penological interests" behind the regulation:

> Petitioners have identified  both security and rehabilitation concerns in support of the marriage prohibition. The security concern emphasized by petitioners is that "love triangles" might lead to violent confrontations between inmates. With respect to rehabilitation, prison officials testified that female prisoners often were subject to abuse at home or were overly dependent on male figures, and that this dependence or abuse was connected to the crimes they had committed. The superintendent at Renz, petitioner William Turner, testified that in his view, these women prisoners needed to concentrate on developing skills of self-reliance, and that the prohibition on marriage furthered this rehabilitative goal. Petitioners emphasize that the prohibition on marriage should be understood in light of Superintendent Turner's experience with several ill-advised marriage requests from female inmates.

*Id.* at 97 (citations to the record omitted). Under the reasonable relationship test, the Court concluded that the Missouri prison regulation did not pass constitutional muster and represented an "exaggerated response" to "security objectives." Among the facts cited by the Court to support its decision was the "disconnect" between the testimony by prison officials about "love triangles" and how the marriage regulation

13

could be "viewed as preventing such entanglements." *Id.* at 97-98.

In *Obergefell,* the Court extended the fundamental constitutional right to marry to "couples of the same sex": "[T]he right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, couples of the same-sex may not be deprived of that right and that liberty." 135 S. Ct. at 2604-05. As a result, the state marriage laws being challenged were held to be "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 2605. This holding meant that male and female inmates now have a fundamental constitutional right to marry persons of the same sex.[10]

Accordingly, the Court concludes that, at the time Scott submitted her marriage applications to Banks and Golden, a few months *after* the decision in *Obergefell,* she had a clearly established constitutional right to marry Struble.

### 2.    The Supported Facts, Viewed in a Light Most Favorable to Scott, Show That Banks and Golden Violated Her Constitutional Rights by Denying Her Applications to Marry Struble

On March 12, 2016, Scott filed a Grievance claiming that both Banks *and* Golden had denied her applications to marry Struble "due to [her] partner [Struble] and [Scott] being the same sex." *Doc. 36, Ex. C at 3.*

---

[10]Because Scott submitted her first marriage application only a few months after the Court's decision in *Obergefell,* she may have been the first Arkansas prisoner to submit a same-sex marriage application.

On April 6, 2016, Golden wrote a "Memorandum" to Scott "absolutely deny[ing]" that it was the same-sex aspect of the request that was "the reason why I have denied Ms. Struble and you to marry." He then provided "several reasons" for denying what he characterized as Scott's "opportunity" to marry:

> First, Ms. Struble is a convicted felon that is still on supervised parole until 2019 … [a] fact [which] contradicts the agency's responsibility to ensure appropriate security practices on inmate contact with other known felons in and outside the prison. Secondly, Ms. Struble and you had an offender separation during her incarceration here … which is still in effect and will be enforced if ever she returns [presumably to visit Scott]. Thirdly, Ms. Struble is not listed on your approved visitors list … because of her status as a parolee.

Golden concludes his Memorandum by "assur[ing] you [Scott] we will follow the laws of this land and our state in regards to allowing those who are eligible to marry and who meet our security and policy practices and guidelines regardless of sexual orientation." *Id. at 5.*

On April 20, 2016, Golden filed a Response denying Scott's Grievance for the *same reasons* explained in his April 6, 2016 Memorandum. *Id. at 2.* On May 4, 2016, Deputy Director Payne found Scott's appeal to be without merit. *Id. at 1.*

Golden's first stated reason for denying Scott's application to marry Struble was based on Struble being on "supervised parole," something that "contradicts the agency's responsibility to ensure appropriate security practices on inmate contact with other known felons in and outside the prison." Of course, all prisoners in the McPherson Unit have "contact with other known felons in … prison," *every day of*

*their incarceration,* and it is part of "the agency's responsibility to ensure appropriate security practices" regarding that contact. The only "contact" Scott proposed having with Struble, a former inmate now on parole, required her being allowed inside the McPherson Unit, *on a one-time basis,* to exchange wedding vows with Scott. On its face, nothing about that brief contact between Scott and Struble, for the limited purpose of participating in a marriage ceremony, would seem to "contradict[] the agency's responsibility to ensure appropriate security practices" as between Scott, an inmate, and Struble, a parolee who was now "outside" the prison. Finally, Scott's proposed brief and limited contact with Struble would appear to implicate *far fewer* "security concerns" than the ones the "agency" is required to deal with on a daily basis by and among the many felons incarcerated together "inside" the McPherson Unit.

Golden's second reason for denying the marriage application, based on Scott and Struble receiving an unexplained and undefined "offender separation" while they were incarcerated together, was *explicitly denied* by Scott in her sworn deposition testimony. *Doc. 56, Ex. A at 40-41.* Golden has not submitted an Affidavit or Declaration to rebut her testimony, or attached any documentation to substantiate that Scott and Struble actually received the alleged "offender separation." Finally, in Golden's Memorandum and Response to Scott's Grievance, he fails to explain how the "offender separation" (which would have been issued no sooner than *about five*

*years ago*) still raised legitimate "security concerns" sufficient to deny Scott's application to marry Struble.

Golden's third reason for denying Scott's marriage application, because Struble was a "parolee" who could not be "listed on [Scott's] approved visitors list," is essentially the same ground he raised as his first reason for denying Scott's marriage application. It suffers from the same previously discussed deficiencies and creates the same impression it may be an "exaggerated response" to the alleged "security concerns."

Scott testified in her deposition that: (1) she and Struble never received any disciplinaries for "joint misconduct" while they were incarcerated together in the McPherson Unit; and (2) they were never placed on "offender separation status" during their incarceration together. *Doc. 56, Ex. A at 40-41.* In her Opposition to Defendants' Statement of Undisputed Material Facts, Scott states that she and Struble never passed any contraband to each other. *Doc. 77 ¶ 7; see also Doc. 60 at 1-2; Doc. 75 at 3.*

In their Responses and Reply Briefs, Defendants have *not* controverted Scott's sworn testimony that she and Struble were never placed on "offender separation status" during their incarceration together. Similarly, Defendants have *not* come forward with any disciplinaries or other documents establishing that Scott and Struble were involved in joint contraband violations. *See Doc. 60 at 1-2; Doc. 75 at*

*3; Doc. 77 ¶ 7; Doc. 78.* Thus, the only sworn testimony now before the Court indicates that Golden's second reason for denying Scott's application to marry Struble may not be true.

Scott also argues that the ADC marriage policies are applied inconsistently, depending on the warden, and that "some felons were allowed [to marry] and some were not." *Doc. 60 at 2; Doc. 75 at 3; Doc. 77 ¶¶ 8-9.* In support of her position, she provides documentation showing that, on July 12, 2018, Corinna Puckett, a female inmate at the ADC's Wrightsville Unit, married Mitzy Dillard, who was a "high-status felon" on parole at the time of the marriage. *Doc. 75, Ex. 2; Doc. 77 ¶¶ 7-9 & Ex. 2.* She also notes that nothing in the ADC marriage directive states that prisoners are prohibited from marrying parolees.

In *Overton v. Bazzetta,* 539 U.S. 126 (2003), the Court addressed whether newly enacted prison visitation regulations, imposed by the Michigan Department of Corrections ("MDOC"), violated inmates' rights under the First, Eighth, and Fourteenth Amendments. Those new regulations were promulgated and enacted by the MDOC in response to a rising inmate population and a growing number of visitors who strained state resources allocated for prison supervision. In support of the constitutionality of the new and more restrictive regulations, the MDOC *presented testimony and other evidence from prison officials* to explain why they were necessary "to maintain order during visitation and to prevent smuggling or

trafficking in drugs." *Id.* at 129.

One of the new regulations that was challenged only allowed inmates to "place a former prisoner on the visitor list [if] the former prisoner is a member of the inmate's immediate family and the warden has given prior approval." *Id.* at 130. While the Court upheld the constitutionality of that regulation as having "a self-evident connection to the State's interest in maintaining prison security and preventing future crimes," it went on to note that if visitation privileges "were applied in an arbitrary manner to a particular inmate, the case would present different considerations." *Id.* at 133-34 & 137.

Here, Scott's marriage application only required Banks and Golden to decide if Struble could be allowed inside the McPherson Unit, on a one-time basis, to exchange wedding vows with her fiancée. Nothing in Scott's marriage application sought to have Struble added to Scott's "approved visitor list" so that she could visit Scott after their marriage, something that would have taken care of itself, in about one year, when Scott was scheduled to be released on parole.

Thus, if Banks or Golden had granted Scott's applications to marry Struble, guards only would have been required to admit Struble to the McPherson Unit *one time,* for a brief marriage ceremony, and then to escort her back outside. Nowhere in Golden's Memorandum or his Response denying Scott's Grievance does he ever address that narrow issue and explain, in the context of those facts, the specific

"security concerns" that justified denying Scott's application to marry Struble.

The Court does not rule out the possibility that Golden may have had legitimate security concerns for denying Scott's application to marry Struble, such as Struble having: a violent criminal history; a violent or otherwise serious disciplinary history while she was incarcerated in the McPherson Unit; or a history of misconduct and poor performance while on parole. However, Banks and Golden have provided the Court with *no such facts* to support their decision to deny Scott's marriage applications. Instead, the three vague and facially problematic "security concerns" cited by Golden, in the April 6, 2016 Memorandum and in his Response denying Scott's Grievance, suggests that they may have been made "out of whole cloth."[11]

Finally, in her appeal of Golden's denial of her Grievance, Scott pointed out that AD 13-59 § IV(M) *explicitly allows* "inmates of different Units/Centers … to marry … subject to the same limitations and conditions as those imposed on an inmate to non-inmate marriage ceremony." *See Doc. 36, Ex. C at 2.* In her summary judgment papers, she provides several examples of "felons who [were allowed] to

---

[11]At trial, Golden may well offer testimony that provides the currently *missing facts* which explain those reasons in a way that establishes "legitimate security concerns" for denying Scott's marriage applications. However, with *no facts* having been properly presented to support Defendants' Motion for Summary Judgment, the Court can only point out the current deficiencies in the vaguely stated reasons provided by Golden in his Memorandum and Response to Scott's Grievance.

marry while incarcerated." *Doc. 60 at 2; Doc. 74 at 2; Doc. 75 at 3; Doc. 77 ¶¶ 7-9.*

In appropriate cases, section IV(M) allows a convicted felon, currently incarcerated in one ADC unit, to leave that unit (presumably under guard) and travel to another ADC unit, where he or she is permitted to enter for the purpose of marrying another convicted felon. On its face, it would seem the "security concerns" associated with arranging and allowing such a marriage would be *far greater* than the security concerns associated with allowing a "non-inmate parolee" like Struble, who had been successfully living in the free world for about five years, to enter the McPherson Unit to marry Scott. Suffice it to say, section IV(M) casts additional doubt on the legitimacy of the first and third reasons given by Golden for denying Scott's marriage application, *i.e.,* "Struble is a convicted felon [and] … this fact contradicts the agency's responsibility to ensure appropriate security practices on inmate contact with other known felons in and outside the prison," and "her status as a parolee" prevented Struble from being allowed inside the McPherson Unit.

Finally, at least some of the inmates who are allowed to marry other inmates, pursuant to section IV(M), are destined to be released *on parole* while their spouses remain incarcerated. Because the ADC's marriage directive explicitly permits inmates in "different Units/Centers" to marry each other, the ADC seemingly would be required to allow the *paroled spouse* to have his or her name added to the still

21

incarcerated spouse's "approved visitor list." Of course, the Court is left to speculate about that issue and countless other material facts because Defendants have done *nothing* to develop the record with any sworn testimony explaining the rational relationship between the ADC's marriage directive and the legitimate "security concerns" that were the basis for their decision not to allow Scott to marry Struble. As a result, it is impossible for the Court to meaningfully evaluate Banks and Golden's reasons for denying Scott's marriage applications and whether they were based on genuine "security concerns" or an "exaggerated response" that served as a pretext for discrimination.

Thus, the Court concludes that the supported facts, viewed in a light most favorable to Scott, show that Banks and Golden violated her constitutional rights by denying her applications to marry Struble. Accordingly, Defendants' Motion for Summary Judgment, based on qualified immunity, should be denied.

### C.    Defendants' Motion for Summary Judgment Should Also Be Denied Because It Fails to Comply with Rule 56(c)(4)

Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Banks and Golden are the only "affiants or declarants" who have *personal knowledge* of the facts supporting their reasons for denying Scott's applications to

marry Struble. Without those facts, it is impossible for the Court to evaluate whether their actions were "reasonably related" to "legitimate penological objectives" or an "exaggerated response" that was a pretext for discrimination. *See Turner,* 482 U.S. at 91, 99. Because neither of them submitted a sworn Affidavit or Declaration, executed under penalty of perjury, they have presented *no facts* which the Court can consider in evaluating the qualified immunity defense that serves as one of their grounds for summary judgment.[12]

The "Declaration of Nicole Lang" (*Doc. 69, Ex. 1*) is filled with hearsay statements about *Golden's* reasons for denying Scott's marriage application (*see id.* ¶¶ 4, 5 & 7-10). In paragraph 6, Lang abandons hearsay in favor of *legal conclusions* and states that: (1) Golden's denial of Scott's second marriage application was based on "security concerns" that were "consistent with ADC policy and practice"; and (2)

---

[12]The Eighth Circuit has repeatedly "rejected attempts by district courts to enter truncated orders that do not provide a thorough determination of the defendants' claim of qualified immunity." *Robbins v. Becker*, 715 F.3d 691, 694 (8th Cir. 2013); *see also Walton v. Dawson*, 752 F.3d 1109, 1116-17 (8th Cir. 2014); *Wright v. United States*, 545 Fed. Appx. 588, 589 (8th Cir. 2013) (a district court cannot "merely note the existence of disputed facts and summarily decide that qualified immunity is inapplicable"); *Jones v. McNeese*, 675 F.3d 1158, 1163 (8th Cir. 2012) (remanding "because the [district court's] analysis [was] so scant that [the appellate court was] unable to discern if the district court even applied both steps of the qualified immunity inquiry to all of the summary judgment claims"). In particular, district courts "must make reasoned 'findings of fact and conclusions of law' sufficient to permit meaningful appellate review of the qualified immunity decision." *Walton*, 752 F.3d at 1116. The court is also required to provide an "individualized analysis of each officer's alleged conduct." *Id.* at 1125. In order for the trial court to perform its fact-finding function, a defendant must properly develop and present the relevant facts supporting the affirmative defense of qualified immunity, consistent with the requirements of Rule 56(c)(4).

Golden's decision to deny Scott's second marriage application "was not based upon the fact that the prospective spouse, [Struble], was of the same sex as Scott."[13]

*Nothing* in Lang's Declaration mentions *anything* about the reasons for Banks's decision, in December of 2015, to deny Scott's first application to marry Struble. Literally, the record is silent on the factual underpinnings for Banks's decision to deny Scott's fundamental right to marry.

In *Turner,* the Court emphasized the importance of carefully considering the testimony of witnesses in evaluating if the prison regulation governing an inmate's right to marry was reasonably related to "legitimate security concerns," rather than an "exaggerated response to [such] security concerns." *Turner,* 482 U.S. at 91, 97-98. After the Court's recent decision in *Obergefell,* those important facts must now be developed and analyzed in cases like this one, in which an inmate makes a same-sex marriage request, an issue that still remains controversial to some.

---

[13]An affidavit or declaration which does not satisfy the requirements of Rule 56(c)(4) may be stricken or disregarded. *See Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015); *Brooks v. Tri–Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) ("When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment."); *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004) (in reviewing a summary judgment motion, the court must "consider only admissible evidence and [must] disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact"); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983) ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient."); *see also Jesinoski v. Countrywide Home Loans, Inc.*, 883 F.3d 1010, 1014 (8th Cir. 2018) (a party may not defeat summary judgment with "textbook inadmissible hearsay," *i.e.*, an affiant's representation about what another person described); *Ward v. Int'l Paper Co.*, 509 F.3d 457, 462 (8th Cir. 2007) (court cannot consider affidavits containing inadmissible hearsay).

Defendants have failed to establish *any* of the material facts necessary to support their Motion for Summary Judgment. Furthermore, in her motion papers, Scott has made it clear those material facts are hotly disputed, which means they can only be properly resolved by a jury.

**D.    Scott's Motion for Summary Judgment Should Also Be Denied**

The many hotly disputed genuine issues of material fact surrounding Banks and Golden's decisions to deny Scott's marriage applications also prevent the Court from deciding the merits of her constitutional claims under Rule 56. Accordingly, the Court recommends that Scott's Motion for Summary Judgment also be denied.

## III.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment *(Doc. 69)* be DENIED.

2.    Scott's Motion for Summary Judgment (*Docs. 52 & 60)* be DENIED.

DATED this 7th day of March, 2019.

_____
UNITED STATES MAGISTRATE JUDGE